The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Be seated. Madam Clerk, call the third case, if you would. The next case is case number 21-2223, Azucena Zamorano Aleman v. City of Charlotte et al. Mr. Largus? Right here, Your Honor. Thank you very much. Good morning. Good to have you with us, sir. It's a pleasure to be here and thank you for the opportunity. We're here on a grand summary judgment to the defendants. So obviously, the settled question is, were there any facts in this record that warrant a trial in this case? This case is unusual in that there are so many videos. Four officers. This is also, this was an interlocutory appeal. No, this is a grand summary judgment. Pardon? No, OK. It's a final decision, grand summary judgment. Well, it's on qualified immunity. No, sir. On the merits. It was a reasonableness point. OK. And all the state law claims are dismissed as well. So it's a complete summary judgment order. Here, this is from Judge Conrad. Before Judge Conrad, four non-Spanish speaking officers respond to a call.  So the question is, is there a dispute about the reasonableness of the shooting? And in fact, you know, is that these recent cases, Nibbs and Hensley, was there an immediate threat that justified the shooting? So you have four officers respond, deciding not to wait for a Spanish speaking officer to a gentleman who's called the Spanish line and asked for a Spanish officer to come help him surrender a gun. It's a bizarre series of phone conversations. The gentleman's paranoid, mentally ill. But the officers don't wait. And when they arrive, they each have a body camera. And those four body cameras. And how many times did the lady on the 9-1-1 call, calls, tell him to surrender or come out without the gun? I think that Judge Conrad counted six. I don't dispute that. And I don't think that's the dispositive issue in the case. I didn't say it was dispositive. I meant to use the facts. Right. Don't get the facts wrong. But what the videos show, Your Honor. But the videos, and there are four videos. There are more than four. There are four at the scene. The body cameras at the scene show this kind of disturbing image of a gentleman with both hands up in the air like this as he is gunned down. Now, are you referring to Dr. Tran, Officer Tran-Thompson's video? Yes. Tran-Thompson's, which is at, I can give you the site. The clip is at 2016, which is the easiest one to look at. It's about a minute and 20 seconds long. But you can see at the end of that, he has his hands up. Then at 20-1 is this composite video. And it shows from the perspective of all four officers are kind of put into a clip. And the two officers who are on the other side of the building from where Guerra is standing, they can see that he's holding the gun upside down. And the video shows that. And Judge Conrad found that. One of those officers. But we, I mean, I take that we agree that that angle is not what the officer, the defendant, could see. We can't understand that that's what he saw. He's seeing it from a different angle. I understand. But listen to what Judge Conrad and the defendants have omitted, Your Honor. And that is the next clip that you see is the interview of Tran-Thompson, who's behind Guerra. And he describes the exact same position of the glove. You know, Batson says he's holding it like this drop down from his hand. His left hand. I'm sorry. Left hand. He's holding it in his left. I apologize. If you're Guerra, he's holding it. You're trying to explain how he's holding it. Now, both of the experts, according to what I read, said, well, he could have fired it as he was holding it. In theory. You're emphasizing, and I think you did in your papers and everything as well, the way he was holding the firearm. But both of the experts, your expert and their expert, apparently basically agreed that you can fire a gun when you're holding it upside down. But what he said is, in theory, you can do it. But it's a potential question. It is. It's a potential threat. But is it an immediate threat is the question. And the rest of the videos show that it was not. If this is the gun and this is the barrel away from my hand, Your Honor, he's holding it like this. And you are Guerra. So not only is the hand away from you, but the gun is pointed even further. That can't be seen. Oh, no. Tran Thompson can see that he's holding the gun like this. Tran Thompson was not the officer. He's behind the officer, directly behind him. No, he's not directly. He's off to the left. He might be 10 degrees to the left. The video of the officer who fired is blocked by the edge of the apartment building. Right. There you go. Which shows how much cover. It's part of one hand and not the other hand, not the left hand. You can see part of the right, part of the right arm, I think. I'm no expert, but these experts and particularly Judge Conrad looked at those videos, too. Judge Conrad never mentioned Tran Thompson's video in his order, Your Honor. Never. And instead, he found that it was impossible. He found that Guerra could not see that the gun was not positioned the way that Batson said it. But he could see the way that Tran Thompson could see it from even farther away. That's a material issue of fact in this case. And an improper fact-finding effect to say that the video proves in this case that Guerra could not see the gun. Guerra describes the gun in intimate detail and describes having a pistol grip, his hand in a pistol grip on it. I don't know about what the video showed. Exactly. Maybe he did see the gun. But according to the video, it doesn't show the gun. The video taken by Guerra doesn't show the gun. No, it doesn't. But the video by Tran Thompson, who is at the roughly same angle, not exactly, but he... Mr. Largest, I'm sorry, I didn't mean to interrupt you. No, go ahead, Your Honor. I think your argument would be more helpful, perhaps, for the court if you could discuss for us what facts are in dispute and whether the trial court resolved any of those disputed facts in reaching its determination on summary judgment. In other words, went outside the mandate of the summary judgment rule. I was trying to get there. What are the disputed facts in the case? And did the trial court resolve any of those in favor of the defendant improperly? It did, Your Honor. At least several. The first is what we were getting at here. The court declares what Guerra cannot see. That's a disputed issue fact in this case. Guerra, two days later, on video, comes in and demonstrates this remarkably different encounter from what you see in the Tran Thompson video. If you look at those two videos, and the clips are at... I'm sorry. 2032 and 2033. He says that Galindo came out with both hands up and kept his right hand up the whole time, which clearly didn't happen, drops his left hand down and takes the gun out, and then points it at him like this. Like, I'm pointing at you right now, Judge King. And that's why he shot him. The video shows that that never happened. That conflict right there is the fundamental factual dispute in this case that the judge didn't even address, let alone... Instead, what Judge Conrad did, he chastised us for pointing out that remarkably different version of events. Well, the judge found that Galindo reached into his pocket for a gun. He did. In the discussion at pages 10 to 12 of his opinion. Right, but not that he had his hands up and reached down from a hand-up position and pulled it out. And there's a question of fact as to whether he pulled it out of his pocket or whether he walked out of the door. I guess I'm trying to tell you this is a friendly question. The judge said, instead of raising his hands in response to Officer Garos Manos' command, Galindo reached into his pocket for a gun. Now, could you tell us whether those facts were in dispute? What's in dispute, in that regard, is that when he came out and yelled Manos, Mr. Galindo, who's just come off the phone with the translator, and said, tell me, I'll throw it down, tell me how I should display the gun. And he comes out and he hesitates putting it up and then puts it up fully as Officer Garos, with his one hand, says Manos, Manos. He holds up his one hand. And then when they start yelling at him in English to drop the gun, he puts up the other hand. And the judge finds that he refused the English command to drop the weapon. Can you imagine if the officers gave a native English speaker commands in Spanish to drop a weapon for three seconds and then shot him for not complying? That's a good jury argument. It is. You've got to convince us, lay out for us, what the disputed facts were that warranted your going to trial. Well, the disputed facts are whether he, in fact, failed to follow commands. Whether, in fact... But isn't the question, I guess I'm having a little trouble there, right? So, I mean, there's no doubt he did fail to follow the command. The question is, why did he fail to follow the command? Right. And, you know, the officer testified, and I think reasonably, that even people who speak Spanish, that live in America, understand some English. And so, you know, I took that to sort of a vaguely mean that I believe he understood drop the gun. Right? Even if maybe he couldn't have had a discussion about, you know, the causes of inflation and what we're doing to resolve it. I think that's a question of fact, Your Honor. Is someone in a crisis like that with four people yelling in a foreign language to him? Drop it, put it down, drop it, put it down. And that's why I'm saying the analogy. But why is that a question of fact? Because what I said was, there is no question of fact that he did not comply with the command. Exactly. Right? And is also, there is no way for us to know why he did not comply with the command. Right. Right? Because the only person who knows that information is dead. Right. And so, what's the disputed fact there? Right? You wanted to focus, I just was trying to get at your focus. Your focus was, it's unreasonable to say that he didn't comply with the command. We know he didn't comply with the command. The question is why, but there's no dispute about that because there's no position on it one way or the other. All we know is he didn't comply. Okay, well, I hear you. My perspective on it is a little different, but I hear you. But the other issue is that he then says, this is a split-second decision. And it was, but the question there is, that goes essentially to the reasonableness of the shooting. These officers are all behind cover. And though this man has not dropped his gun, he's holding it in a completely harmless position. And there were two experts on our side and one of them got convinced to say, yeah, it's in theory you can fire a gun with a pinky, but he would have to turn the gun upside down and point it. You know, he's holding it over here. And so why, wait, why not wait? You have cases in this district where people who are armed and the officers wait seven hours. How many seconds did they have to deal with this fellow? As much as they wanted. They're all behind cover. No, but, well, the video is six or eight seconds long. You say that's all covered right there. He's behind cover that entire time. Well, you're going back and saying the only thing they could do was not, it was, what, are they going to wait seven hours? No, no, no, no. What I'm saying is that you have cases where... When they get this call? You have cases where people who are... They're responding to people in trouble. He's responding to someone asking to turn in a weapon.  is being pursued as armed and they wait. To these police officers. Sorry? We give deference to them. I know you do. I mean, the Supreme Court said, we don't use 2020 look back, right? But you can't create... In gray areas, what is the language about that? But here's the final disputed issue factor. That's what disqualified immunity is all about. Let me get... That they act reasonably. Exactly, Your Honor. Let me get to the last thing. Can I ask this? Because you just said that he called... I'm having a little hard time understanding whether the facts you're giving me are really the facts. Because you just said, and I don't understand this to be true, that he called asking to turn in a gun. Yes. Tell me where in the record, where do I find that piece of the record? In the translation of the first call, he's explaining, I have a gun. I want to surrender it. I have a court date. I want to surrender. People are following me. And then when he says to the translator in the second call, that I'm not going to leave the gun in the house. I have it in the bag. If it's better to take it out, tell me. I will throw it down. Tell me how you want me to show it to them. So they know... And they say, leave it in the house. And he refuses. And the mentally ill man refuses. And then he comes out and he's standing erect with his hands up when he's killed by officers behind cover. But here's the final disputed issue of fact. And this is, I think, Jacob's issue in this case. He called to ask for help. For help. Is that right? He asked for help more than once. He said he was calling for help. Because I have the gun. He said he had a gun. I have a gun. I need help. I have a gun. And he... I can go through the transcript carefully and send you an addendum every place where he mentions the gun, Your Honor. But I think that it's clear they knew he had a gun. And they were... But the question is, there's no doubt he has a gun. The question is, did he call asking to turn in the gun? He mentions a gun. I don't deny that. I didn't understand it the way you characterized it. But I can go back and read it. I don't need you to point it out. I don't mean to take him over, Judge. I'm sorry. He has a court date, Your Honor, that week for assault by pointing the weapon. He's trying to surrender the gun for that purpose. He called to ask for help and turn himself in. And he said, I have a gun, during the course of the discussion. And the dispatcher, you said, accepted, told him six times not to come out with the gun. And clearly that creates a dangerous situation, Your Honor. Before they went out there. Exactly. And the dispatcher told him six times, don't come with the gun. And he goes out with the gun. They know he's coming out with the gun. He claims there's no bullets. But here's the finding of fact that I want to get to. Judge Conrad, rather than trying to address the discrepancy between the way Guerra justified the shooting by saying, he pointed the gun at me. That was the immediate threat he gave. He says that when he had his hands up like this, his left hand began to drop before he was shot. Look at that video. There's no way that you can make a finding like that. That's the threat that Judge Conrad created to justify the shooting. That he dropped his hand at the end. And now the defendants try to piggyback on that and try to somehow tie that to the perception that Guerra had. But Guerra never said that. We showed them the video and both he and Trent Thompson said, you don't see the hand move until he's shot. And both hands come down at the same time. But that's the basis for finding the immediate threat. And that's improper fact finding. I've gone well over my time. I apologize. As long as you have questions, you can answer as long as I'm concerned. You saved some time. Ms. Keeton? May it please the court, Your Honor. Good to have you with us, Ms. Keeton. Thank you for having me. Oh, sorry. I had to be reminded I could take off my mask. I was here yesterday and I messed up the clock. Today I messed up the mask. So let's hope those are my only bad mistakes. Your Honor, I represent Officer David Guerra in this matter. And if I may, I would like to pick up where you all left off momentarily with some of your questions. One thing that was mentioned in Mr. Largesta's argument, you all asked about whether Tran Thompson's video was mentioned in Judge Conrad's opinion. Your Honors, I would point you to the fact that he does, in fact, mention Tran Thompson's video in footnote two on page five. He specifically says that he says that the footage from Tran Thompson's body-worn camera would most accurately capture the scene as close to as Guerra would have experienced it. So he did, in fact, specifically say that... I think he's talking about the video of the interview, not the body cam video. I think when he referred to Tran Thompson's video not being mentioned, I took him not to be referring to his body cam video, but instead to the interview, right, where Tran Thompson says, I saw the gun dangling. Okay. I understood. But he does say that he relied on the body-worn camera footage and he took the facts in the light most favorable to the plaintiff, just as you were supposed to do at summary judgment. We don't dispute that that's the standard here. And he specifically does talk about, very specifically in that footnote, that the evidence was looked at most favorable to the plaintiff and they relied on the video footage. But we do have the issue that your Honors have appropriately pointed out, and that is the fact that you cannot utilize the body-worn camera from the standpoint which Officer Guerra could not see. The best we have is we do have Guerra's body-worn camera and then we have Tran Thompson, who was approximately 10 feet away to the left. And I would note, with regards to Tran Thompson, since it's come up, the idea that his perspective and what he said in his interview, he also said that he flipped the safety mechanism off of his rifle and began to move his finger to the trigger. And that's in the record and the joint appendix. So I would say that he, too, perceived a threat here. And I think that your Honors appropriately focused in on the fact here that the gun... We have to stake for the record that we've got, taking the facts in the light, most favorable, that given Tran Thompson's interview and his positioning relative to the defendant, that, you know, an officer in the gun was being held in a manner inconsistent with the way the defendant described it. I think the key here is the objective of a reasonable officer in Guerra's position. And we do not look at subjective intent. We don't look at subjective intent, right? But what we do say is we have objective evidence that the gun was, in fact... Sorry. I'll use my left hand. Right? That the gun was, in fact, held in a dangling manner, not high and tight. Right? I mean, we have video that we know that was true, right, from the other angle. Correct. Right? Second, we have Tran Thompson, who is in the same line of sight behind the defendant, and he sees that the gun is hanging in some manner, in other words, not high and tight. And so I guess what I'm asking is, given those two pieces of information, right, A, that it's objectively true that it was not high and tight, it was that another officer perceived the hanging in that, in the same, you know, visual sight line as the defendant, that that is, in fact, what the defendant saw, right? Not that his subjective beliefs, right, but the, like, perceptions we have to look at from what a reasonable officer would have seen. And Tran Thompson seems like, at least in the light most favorable to the defendant, that perspective. Am I getting that right? I understand what you're saying, Your Honor. I think you are, in terms of a reasonable officer who was standing where Tran Thompson was, would have seen that. And that is how I would interpret it. And I think what matters here is, as you all are well aware, we look at the totality of the circumstances. So we don't just take the segmented view of, at that moment, the gun was held upside down, and even though the experts acknowledge it could be shot that way, that it was held upside down. But what we have to keep in mind is it's being held after he's been told, in his native language, six times to leave the gun inside and to show his hands, he was told that in Spanish as well, before he walks out into the apartment complex of 200 to 400 people. And so, I'm sorry. The fact, though, Ms. Keeton, that the trial court seemed to be resolving the case in the light, stating the facts in the light most favorable to the defendant. I mean, the trial court said that instead of raising his hands in response the court found this is the single most compelling fact. He said this on page 12. That instead of raising his hands in response to Officer Garrow's Manos command, Galindo reached into his pocket for a gun. Now, that's a disputed fact, isn't it? Whether he reached into his pocket for a gun. And then the district court says in another place that it relied on the video to resolve any conflicts in the evidence. So, what worries me in this case is a jury might very well find for the officer. But it looks like the trial court stepped into the role of fact finder to resolve disputed facts here by saying that Galindo, the decedent, reached into his pocket for a gun. That's disputed, isn't it? I don't believe that is disputed, Your Honor. And I think that even if he, regardless of whether he reached, the point is that he had been told to leave the gun inside. Can you go back to that point? I'm actually curious to the answer to that question before you go back to leave the gun inside. Help me understand. Why is it not disputed? I think I might agree with you again in the nature of this is, I think, a friendly question. Why is it disputed? Is there any evidence that he did not reach into his pocket? I mean, the video seems to show that. Several officers testified to it. Is there, and maybe there is, is there testimony to the contrary that he never reached into his pocket and got the gun? There is not, Your Honor. Is there testimony that when he came out the door, he had the gun in his hand already? No, Your Honor. And the fact is, he was told, manos, manos, he shows his hands, and then he reaches back down and gets the gun. And so he was definitely defying the commands he'd been given. And I would say it's not a disputed fact, because it's no different than the cases where this court has frequently had to make determinations and found that qualified immunity applied. For instance, you all have looked at, okay, this person was reaching, they thought it was a gun. Oh, I'm sorry. So, Your Honor, I'm sorry if I didn't finish answering your question. I do not believe it's a disputed fact, Your Honor. Yeah, I guess it's when the court's saying on page 13 of its opinion, to the extent there is discrepancy between Officer Guerra's testimony and the video footage, the court relies on the video footage, especially that taken by Officer Tran-Thompson's body camera. So, I'm just wondering if the court's saying that, you know, I'm worried in this case that perhaps the court entered into the role of fact finder. The court's saying, well, the evidence, to the extent there may be a discrepancy, suggesting there may be, I resolved it by looking at the Tran-Thompson video. So, is that the role of the trial court on summary judgment? And I think, Your Honor, looking at the body-worn camera when it's not, when there isn't a disputed fact and going by what the camera shows is the appropriate method to handle that. And so, that is, I think, exactly what he did here. I think that he looked at the body-worn camera. Do we have cases that say, that effectively say that, that on summary judgment where there's indisputable video, like video evidence that, you know, a contrary statement does not raise a material issue of fact? I mean, you know, if, for example, you know, somebody said Superman flew down into the screen, we wouldn't think that's a disputed fact. So, it seems hard given that there's a video. If it's not on the video, it's one thing. But if it's on the video, doesn't that mean it's not disputed? Right, Your Honor. And I think the case that plaintiff actually cites, too, that's helpful on this point is Scott v. Harris. And in that case, they talk about the fact that there was a motion for summary judgment that raised factual issues about whether a motorist was fleeing law enforcement officials and was he driving in such a fashion as to endanger human life at the time that the deputy rammed the motorist's car from behind to put an end to the chase. And the Supreme Court determined there that the motorist's version of events was so utterly discredited by the record that the jury could not have believed him and thus the court should have viewed the facts in the light depicted by the videotape rather than the motorist's testimony. So, I guess what I'm saying here is, to the extent you think that his testimony is not credible or it's been discredited, then Scott teaches us that you view the facts in the light depicted by the videotape. So, that is Scott v. Harris, 530 U.S. 372. So, I believe that is exactly what was done here is we relied upon the video when if there was any question of fact. But the video was really ambiguous as to whether he reached into his pocket. I mean, I looked at the video. You couldn't tell whether he reached into his pocket. Yet the court said he reached into his pocket. And so, I understand that that is your position. And so, I would... It's not my position. I looked at the video really carefully. Understood. And the video did not show him reaching into a pocket. The video showed his hand going down. Now, and the court's saying he reached into his pocket. So, you're saying the court can just put all this together? And I'm just worried about the jury's role and the court's role. And, you know, it's a tragic case. And I just want to make sure that the court didn't step over into the jury box. And it is a tragic case, Your Honor. And I would certainly say then, to finish my argument out, we can certainly assume for the purposes of this record, let's assume that the evidence in light and in favor of the plaintiff that he didn't reach in his pocket, that he had the gun in his hand. And there's no dispute he had a gun. Like many of the cases that are cited before in the briefs, the person ended up not having a gun. It's undisputed he had a gun in his hand. It's undisputed he was told to leave it inside six times in his native language to come out with his arms up. It is undisputed that he raised his arms. The plaintiff wants to suggest that raising your arms up is the universal position of surrender. It is undisputed that he raises his arms up with that gun in his hand. That portion is not disputed, whether he had it... ...dangling in his hand. ...with it dangling in his hand. And so that portion is not disputed. And so I would say, Your Honor, that the whole purpose of qualified immunity is that we don't sit here and judge the conduct of the officer with the benefit of hindsight, but we consider would a reasonable officer in that position who goes to a call after two 911 calls of someone who is delusional, who's been drinking, who has a prior charge for pointing a weapon, of which the officer is aware, who has been uncooperative with the dispatchers, and then he comes out the door and he has the gun in his hand, and then Officer Guerra doesn't shoot right away, which, I mean, as we all know, the Fourth Circuit is clear, possession of a weapon in itself is not a reason to shoot someone. That's not what we have here. He then is told, Manos, Manos, and he raises his hand and he keeps the gun in his hand throughout the encounter. And then at the very end, as he's shot, he appears to be dropping it. So, again, we need to make room for, if Your Honor believes this is a mistake, I would say the question then is not, this needs to go to a jury. We need to determine if qualified immunity applies here, and we know that qualified immunity, the whole purpose is to give officers the benefit of the doubt in situations such as this that are tense and rapidly evolving. And that is exactly what we have here on this night. Can the plaintiff overcome the qualified immunity claim through his expert report? I don't believe he can, Your Honor. It's interesting you bring up his expert report. His expert says, his expert makes the point, Mel Tucker, he makes his whole opinion is premised around the notion that Mr. Galindo never pointed his gun at the officer and thus that use of force was inappropriate. And you had an expert that gave a different opinion. Interestingly enough... But for the purposes of summary judgment, the court would need to accept his expert report. Isn't that right? I think that you would take both expert reports into consideration, but if it's a disputed fact, then they get the benefit of the doubt. But in this case, again, I do think we have... Well, they dispute each other. I mean, the experts get different views, two different opinions. They do, but to the extent that his expert gives an opinion that goes against four-circuit established law, I don't think this court is required. Nibs? It just came out. One you all relied on in your brief. I did, I relied on... I did it on you before they got to their reply brief. I know, could y'all wait a few weeks? In Nibs, Your Honor, I think... Wasn't expecting that twist of events. How are you going to deal with that? I'm so glad you asked. In Nibs, Your Honor, I relied on it for two propositions, and that is that even though no serious crime was committed, it did not negate the fact that the force was reasonable. And I think that proposition applies separate and apart from Nibs. I don't think I'm relying... I need Nibs for the proposition that the severity of the crime, just because it's not a severe crime, does not necessarily mean the officer doesn't need to use deadly force, ultimately, depending on what happens at the call. The second thing that I relied on Nibs for was saying that even if the officer misperceived the gun was directed at him, the deputy did not have to actually detect that Nibs was aiming and pulling the trigger in order to be able to shoot. And I think, Your Honor, the important thing there is, as this... But now Nibs has been reversed. It has, but fortunately for the two... How do you get around the Nibs in the... The Fourth Circuit Nibs? I get around it because in that... In that case, the two propositions for which I cited are also stated in Sigman v. Chapel Hill and in McClinigan. So it is still true that even if the person is not pointing the gun at you, you can still use deadly force. And so that was the portion of Nibs that I utilized. It's also important to note that in Nibs, there was no body-worn camera footage. I will also note... So I thought what you would say, because I thought we were talking about qualified immunity, I thought what you'd say is that when we look at whether the law is clearly established, we've got to do it at the time. And that's in 2017. And so that... We can't, for clearly established law, we can't look at Nibs, we can't look at Vetin, we can't look at Hensley, which is decided several months after this particular incident. So all of... And those cases are quite helpful to the plaintiff on the merits, but we can't look at any of those for determining whether the law is clearly established, right? Yes, you're correct on that. Because we have to look at the law at the time of the shoot. That is correct. And the district court didn't assess the clearly established question. That is correct. They didn't need to get there. There's no constitutional violation. That's correct, Your Honor. And on the clearly established point, I would suggest that this court, even if there's a disputed fact, can still make a determination on the clearly established point because that's a matter of law. And so that is something this court could choose to uphold the decision based upon that he was entitled to qualified immunity because it was not clearly established at this point in time that an officer is... If you're going to say that, give us specifically. You were about to do it, I think. Okay. The point that wasn't clearly established. I would say, Your Honor, that at the time of this incident, it was not clearly established that an officer is forbidden to utilize deadly force when he is faced with someone who has disobeyed commands and who is holding that gun in a manner in which it can be shot. And so I think that when you look at the exact question, and as we know from recent Supreme Court decisions, it has to be looked at in a very detailed manner. It's not just the general right of you can be free from excessive force. It has to be much more specific than that. And so in this case, you would have to look at the fact that the officer was faced with a situation where a man was armed, he disobeyed commands, and what he could see at that time. And in that case, it was not clearly established that this would be a violation at that time. And so, Your Honor, I think that that would be the other grounds in which to uphold the decision. And I have this question in my brief. I know my time is up. Page 41. Defendants are not aware of any case where this court has ruled that an officer, while interacting with the subject who has a gun in his hand, which the officer reasonably believes the subject is preparing to fire after the officer has announced his presence and the subject has been commanded to disarm, is not allowed to defend himself from deadly force. With deadly force. So, Your Honor, I will stop now, unless you have further questions. And under what circumstances would we have to decide the clearly established point? If you all decide that there is a potential constitutional violation here, Your Honor, and you disagree with Judge Conrad, and so you would continue the analysis where he stopped. Although, under Felicity A, we don't have to do it that directly. That is correct, Your Honor. You can affirm on the alternative ground that whatever the constitutional violation, it's not clearly established. That is correct, Your Honor. Thank you. Thank you. Appreciate it very much. Uh, McAllen. McAllen. McAllen, Your Honor. You can take your mask off. Good morning, Your Honors. Roger McAllen on behalf of the City of Charlotte. May it please the Court. In this matter, the plaintiff brings a stand-alone claim of negligent training against the City of Charlotte. And in doing so, as you are aware, Judge Conrad said the plaintiff provided no facts or no theory to support such a legal theory going to a jury. In this matter, what we have is two experts on the plaintiff's behalf, neither of which cite to any policy deficiency, neither of which cite to any issues with the training of our officers. What we do have is a plaintiff's expert Hammering, which can be found at JA 692. He actually praises the City of Charlotte. He says we have Spanish-speaking policies related to Spanish-speaking officers and interpretation. We have training on how to deal with mentally distressed people. He actually says those trainings are sufficient, but the officers violated that training. Therefore, the plaintiff proves no evidence before this Court that our training was somehow defective or it caused the incident to occur. North Carolina Court of Appeals Court case, Pryor v. Pruitt, that's going to be 143 NC App. 612. The North Carolina Court of Appeals reviewed such an issue and in that case, they said it could move forward. However, in that case, the plaintiff's expert found that the policies were grossly deficient. That grossly deficient policy led directly to the harm and it was foreseeable. Here, we don't have any of that mentioned. We ask that you uphold the finding of summary judgment in this matter. If you have no questions for me, I will take my seat. Thank you. Thank you very much, sir. Mr. Largess, thank you. Can you start with his argument, the negligent training argument? Sure. There's not like a ton. Y'all don't make a ton of an argument about it. Our argument below was that they hadn't cited a single case in support of a summary judgment for negligent training so I didn't think that we had to respond. That was our argument in the court below and then Judge Conrad did his own research, found cases that they hadn't even mentioned and so we're now appealing that question. The issue here, our expert, Mr. Tucker, put in I can't remember if it was PERP or one of the other police organizations, their standard for dealing with a mentally ill person, said he failed to follow that and Guerra testified that he followed, he's had crisis intervention training and used it in this eight second encounter. He used it. And the city condoned that he properly handled a mental health crisis. And they have a policy. I understand why you might want to say they're not doing a good job of supervising and you think he made mistakes but I don't understand why that's the training piece. Because they said that he acted consistent with his training. So if that's consistent with the training, we could question the jury whether the training's effective. And then you also have a policy that is praised about having a Spanish speaking officer. Where in the record do we see them saying that his actions were wholly consistent with the training? He went through a shooting review board assessment. No, no, but that's to say that we find that the shooting was not improper. That's not to say that he complied with every aspect of our training. That's what they said. There were no training violations. That's the finding in the internal affairs and the shooting review board. It's in their brief. They both found no violations of any city policies. No violations of policies, which is different from saying that there was inadequate training. I just want to understand why we've got a training problem here. And I see lots of allegations about misconduct, but what I don't see is anything that substantiates there being a training problem. And all I can say, I want to get back to the qualified immunity, all I can say is that You brought the negligence claim. We brought the claim. Can you answer his question? I'm just trying to say that our theory on the claim is that they condoned what he did as being consistent with policy and training that he received, and clearly they were not consistent with the training. So it raises a question whether the training was adequate if they say he complied with his training. That's the logic of it. But that's your whole argument. Because after the fact they approved what happened or they didn't discipline him for what happened that ergo there must have been negligent training. That's the argument. On the qualified immunity I don't know if I would use that but I understand what you're saying. That sort of sounds like what you meant. Perhaps. We didn't use that. Here is that on the qualified immunity it is true that this court didn't decide Hensley until 17 but Hensley was based on Cooper which has been the law since 2013 and that was based on Pena saying that there has to be a threat. The mere possession of the gun is not enough. And in Waterman which is cited in Stanton this year, the threat can evaporate in a second. And that's the fact question in this case. As he stands in a position of surrender with the gun hanging like that is there any actual immediate threat at the moment he's killed? If they shot him when he supposedly took the gun out of his pocket we'd have a different case. Is there a factual argument? What is the record site that he did not take the gun out of his pocket? There's a lot of discussion about that. I believe it's in Tran Thompson's interview and deposition that he just said he came out with the gun in his hand. But again I don't think that's sort of the Waterman question. Whether he pulled it out or showed it doesn't really matter. Because once he takes the position that's safe for the people involved and they're all behind cover all these other mistake cases and the use of force, they involve where the officer gives a command and they're approaching them and the person either drops their hands or does something threatening. This is the opposite. By the time they shoot him he's doing what they've asked him to do at least as he understands it. You can't say that because you don't know how he understood it. He said not to bring the gun. He was told not to. He said he was doing what he was told to do. He was told not to come out with the gun. Six times according to you. Once he comes out and it's dangerous the commands are to drop it and to raise his hands. The only command given to him in his he has both manos in the air. That's the question under Waterman whether the time has passed where the immediate danger has passed. That's what this case is about. Judge Conrad got past that by finding that he dropped his hand and created a threat before he was shot. The video does not show that. That's what this case is about. When officers are behind cover and give someone three seconds to comply with commands, they're not threatened in any way. They're all behind cover. Not the six commands that he didn't listen to the first time. Exactly. What I'm saying is the three seconds in English to drop the gun. To give him three seconds while they're behind cover and he's not pointing the gun at anyone and to kill him. I think the jury could find that that was not an immediate threat. Under Cooper and under Conrad, they established that unless there is an immediate threat, you can't use deadly force. I think that's what this case comes to. We should have a jury trial about that. In the video of Guerra giving such a wildly different false explanation of why he fired the gun is something that we should be able to show a jury because he would only give that false explanation if what really happened isn't sufficient. That would be the argument we should be able to make in this case. I think that's consistent with Waterman and Cooper. Thank you. One other thing. Oh, I'm over. No, you go ahead. They haven't mentioned the NIED claim. The what? The negligent infliction of emotional distress claim, which the judge dismissed. You can't even make a rebuttal to it if they haven't talked about it. You briefed it, I guess. We did. Well, but you go ahead. I'm not cutting you off. Thank you. I just wanted to add that if the shooting was unlawful, then the elements of NIED, which is the acronym for it, are met here. It's foreseeable when they come to someone's home that someone behind the door is going to be a loved one. It's foreseeable that when they shoot someone outside the home that the people in the home can have a sensory perception of the shooting, which is what happened. And we have this record of this woman suffering severe emotional distress coming out and seeing him slaughtered. And so I think that we have the NIED claim if you find the shooting was unlawful. And there, the question just isn't the Graham question. The question is whether in all these factors of shooting someone from behind cover, which our expert, Mr. Tucker, said was one of the worst shootings he's seen in his career in terms of the lack of threat to the officers when they decided to kill. We should be able to get those issues before a jury. Thank you. Thank you very much, sir. Thank you. And if we were involved in this pandemic, Bill, we would come down and greet you and take hands with you. We'd appreciate it.
judges: Robert B. King, Julius N. Richardson, Barbara Milano Keenan